UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRITEVISION MEDIA, LLC., | No. C-05-0489 JCS |
| Plaintiff(s), | |
| v. | **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |
| JAVA JACKET, INC., | **[Docket No. 8]** |
| Defendant(s). | |

## I. INTRODUCTION

On Friday, April 22, 2005, Plaintiff's Motion for Preliminary Injunction (the "Motion") came on for hearing. For the reasons stated below, the Motion is DENIED.[1]

## II. BACKGROUND

### A. Facts

On January 1, 2001, BriteVision Media, LLC ("BriteVision") and Java Jacket, Inc. ("Java Jacket") entered into a License Agreement that authorized BriteVision to market an insulating sleeve for hot beverages using technology developed by Java Jacket.[2] Declaration of Brian Morrison in Support of Motion for Preliminary Injunction ("Morrison Decl."), Ex. A (License Agreement). The License Agreement established royalty rates for specified time periods during the term of the Agreement and provided for an initial term of five years, with automatic renewal for one-year periods thereafter. *Id.*,

---

[1] The Court has jurisdiction pursuant to 28 U.S.C. § 636(c), based on the consent of the parties to the jurisdiction of a United States Magistrate Judge.

[2] According to the License Agreement, Java Jacket "owns certain trade secrets and proprietary know-how" relating to the insulating sleeves. Morrison Decl., Ex. A (License Agreement) at 1.

Sections 3 & 4. The License Agreement could be terminated under a variety of circumstances, including by mutual agreement of the parties. *Id.*, Section 13.

The effect of termination was set forth in section 14, which provides as follows:

> 14. <u>Effect of Termination</u>
>
> Upon the expiration or termination of this Agreement, the license set forth herein shall automatically terminate and Licensee shall immediately cease, and cause Manufacturer to immediately cease, to manufacture, offer to sell, sell and distribute Licensed Products. Notwithstanding the foregoing, if the term of this Agreement terminates for a reason other than Licensee's breach or Licensee's violation of Section 13.2(b), Licensee may continue to promote, distribute and sell any Licensed Product in their normal and reasonable inventory at the time of the termination or expiration of the term; provided, Licensee shall continue to pay Licensor royalties in accordance with this Agreement.
>
> Licensee acknowledges and admits that there would be no adequate remedy at law for its failure to comply with any of the material terms and conditions hereof, including, without limitation, its failure to cease the manufacture and sale of Licensed Products upon termination of this Agreement, and Licensee agrees that, in the event of any such failure, Licensor shall be entitled to equitable relief by way of temporary restraining order, temporary injunction and permanent injunction and such other and further relief as any Court with jurisdiction may deem proper.

*Id.*, Section 14.

Finally, the License Agreement contains the following arbitration clause:

> 19. <u>Disputes</u>
>
> In the event of a controversy between the parties or claim arising out of or relating to this Agreement, including, without limitation, the making, performance or interpretation of this Agreement, the parties agree to participate in at least four hours of mediation in accordance with the Mediation Procedures of the United States Arbitration and Mediation of Oregon and to equally split the costs of such mediation. If such controversy or claim is not settled in mediation within ten (10) days after mediation is commenced, it shall be finally settled by arbitration in Portland, Oregon, in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association before a single arbitrator. The non-prevailing party shall pay all arbitration costs of the other party, including reasonable attorneys' fees and costs. The parties agree that all facts and other information relating to any arbitration arising under this Agreement shall be kept confidential to the fullest extent permitted by law.

*Id.*, Section 19.

In April and May 2004, BriteVision and Java Jacket discussed terminating the License Agreement. *See* Morrison Decl., ¶ 3 (stating that in April and May 2004, BriteVision's president, Brian Morrison and

Java Jacket's president, Jay Sorensen, discussed the termination of the License Agreement and the "possibility of forming a new agreement"); Declaration of Jay Sorensen in Opposition to Motion for Preliminary Injunction ("Sorensen Decl."), ¶ 3 (stating that in April 2004, Morrison informed Sorensen that BriteVision "could no longer survive under the 8 percent/$16,000 minimum royalty provision," and that in May 2004, Morrison and Sorensen agreed to terminate the License Agreement effective May 31, 2004, and to "work on renegotiating the compensation provisions"). On May 4, 2004, Morrison sent Sorensen a letter confirming the termination of the License Agreement, stating in part as follows:

> This will confirm that, per our conversation of yesterday, we have agreed that the License Agreement between Java Jacket, Inc. ("Java Jacket") and BriteVision Media LLC ("BVM") dated as of January 1, 2001, has been terminated, effective as of June 1, 2004. Accordingly, BVM will be paying royalties to Java Jacket under the Agreement on Net Revenues received or accrued by BVM through May 31, 2004.
>
> Separately, we discussed the possibility of entering into a new agreement, the scope, term and details of which will, of course, be worked out. . . .

Morrison Decl., Ex. B (May 4, 2004 Letter).

On May 20, 2004, Morrison sent Java Jacket a proposed Production and Sale Agreement, which was to be effective as of June 1, 2004. Sorensen Decl., ¶ 5; Declaration of Ronald T. Adams in Opposition to Motion for Preliminary Injunction ("Adams Decl."), Ex. A (Production and Sale Agreement). That agreement was rejected by Sorensen on the advice of Java Jacket's attorneys. Sorensen Decl., ¶ 5.

On May 28, 2004, Morrison sent Sorensen a letter via e-mail which stated, in part, as follows:

> Jay,
>
> Per our talk this morning . . . since it looks like we won't have any new agreement in place until sometime in June, please sign and return the attached document to me today so we can continue manufacturing [and] using your design in June. Without this assurance, I wouldn't feel comfortable using the existing plates for any production next month. The 500 cases equates to 6000/12 which we agreed. . . .
>
> Brian Morrison

Adams Decl., Ex. C (May 28, 2004 Letter). The letter that was attached to Morrison's e-mail, set up for Sorensen's signature, stated as follows:

> Dear Brian,

United States District Court
For the Northern District of California

> This is to confirm that in consideration for up to 500 cases of 4-color Java Jackets at a rate of $15.00 per case F.O.B. Portland, Oregon, Britevision is granted the full right and permission to utilize Java Jackets' Patent #5,426,497 for any production it wishes to execute during the month of June 2004.
>
> As previously agreed, the Agreement dated January 1, 2002 has been terminated effective June 1, 2004. Accordingly, BriteVision Media will be paying all Royalties due to Java Jacket under the Agreement through May 31, 2004.

Morrison Decl., Ex. C (May 28, 2004 Letter (hereinafter, "the May 28 Agreement")). Sorensen signed and returned the May 28 Agreement. *Id.*, ¶ 5.

On June 16, 2004, Sorensen sent Morrison a proposed amendment to the Production and Sale Agreement. Sorensen Decl., ¶ 7. In the meantime, BriteVision and Java Jacket continued to operate under the May 28 Agreement at least into August 2004. *Id.*, ¶ 8 (stating that Java Jacket permitted Brite Vision to continue to do business under the May 28 Agreement in July and August 2004); *see also* Morrison Decl., ¶ 9 (stating that BriteVision and Java Jacket continued to operate under the May 28, 2004 Agreement until October 2004). At some point in the second half of 2004, BriteVision rejected Java Jacket's proposed amendment to the Production and Sales Agreement and the parties ceased to do business. Sorenson Decl., ¶ 9; Morrison Decl., ¶ 9.

### B. Procedural Background

On December 27, 2004, Java Jacket filed an arbitration demand with the American Arbitration Association ("AAA"), invoking the arbitration clause in the License Agreement. Declaration of Jared S. Macdonald in Support of Motion for Preliminary Injunction ("MacDonald Decl."), Ex. A (December 27, 2004 Arbitration Demand). In the Demand, Java Jacket stated that there were "outstanding issues under the License Agreement" and listed a number of specific issues, including whether BriteVision had given proper notice of termination of the License Agreement to all of its manufacturers, whether it had paid all royalties due under the License Agreement and whether BriteVision was continuing to have cup holders manufactured after termination of the License Agreement. *Id.*

In response, BriteVision sent Java Jacket a letter disputing the jurisdiction of the AAA, arguing that because the parties had terminated the License Agreement and entered into a new legal relationship, that is, the May 28 Agreement, there was no agreement to arbitrate. Java Jacket argued further that some of the

issues raised in the arbitration demand went beyond the scope of the License Agreement. MacDonald Decl., Ex. B (February 2, 2005 Letter). On the same day, BriteVision filed an action in this Court seeking declaratory relief. In the complaint, BriteVision asks the Court for a determination that because the License Agreement has been terminated, BriteVision has no obligation to submit any dispute under the License Agreement to arbitration.

BriteVision now seeks a Preliminary Injunction enjoining Java Jacket from proceeding with arbitration pending a judicial determination as to the arbitrability of the claims raised by Java Jacket in its Arbitration Demand. BriteVision contends that it is likely to succeed on the merits on this issue and further, that it will suffer irreparable harm if the arbitration is not stayed. With respect to the likelihood of success, BriteVision cites to the rule that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *AT & T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 647 (1986) (citation omitted). Here, BriteVision argues, there is no agreement to arbitrate because the May 28 Agreement constituted a novation, thus eviscerating the prior License Agreement. BriteVision argues in the alternative that even if the License Agreement was not replaced by the May 28 Agreement, Section 14 of the License Agreement (entitled, "Effect of Termination") makes clear that the parties envisioned that the arbitration provision of the License Agreement would cease to apply after termination. In particular, Section 14 provides for "equitable relief . . . as any Court with jurisdiction may deem proper." According to BriteVision, because arbitrators are not authorized to fashion such equitable relief, Section 14, by its plain terms, must reflect an understanding by the parties that post-termination disputes could be resolved through litigation.

In response to the Motion, Java Jacket argues that the May 28 Agreement did not constitute a novation. (Java Jacket does not, however, dispute that the License Agreement was terminated). Further, with respect to BriteVision's alternative position, based on Section 14 of the License Agreement, Java Jacket disputes BriteVision's interpretation of that provision, noting that the AAA rules allow arbitrators to award "any remedy that the arbitrator deems just and equitable and within the scope of the agreement." Rule R-43, AAA Commercial Arbitration Rules. Finally, Java Jacket asserts that in any event, the Court does not have jurisdiction over the action because the $75,000.00 amount-in-controversy requirement required for diversity jurisdiction is not satisfied.

## III. ANALYSIS

### A. Legal Standard for Preliminary Injunction

In the Ninth Circuit, a plaintiff can meet its burden for a preliminary injunction by showing "either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 839-840 (9th Cir. 2001). These standards are not separate tests but rather, represent the "outer reaches of a single continuum." *Id.* (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A.*, 4 F.3d 819, 822 (9th Cir.1993)).

### B. Who Decides Whether An Agreement to Arbitrate Exists?

In their briefs, the parties are in agreement that the question of arbitrability is one for the Court to decide rather than the arbitrator. *See* Motion at 5; Opposition at 5. The question of whether the Court or the arbitrator should decide specific issues related to the validity of an agreement to arbitrate is an area of law in which "confusion . . . abounds." 6 Bruner and O'Connor on Construction Law § 20:46 (2005). As Judge Posner has noted, the distinctions drawn by courts in this area of law are often "razor-thin." *Matterhorn, Inc. v. NCR Corp.,* 763 F.2d 866, 872 (7th Circuit). Based on a careful reading of the case law, the Court concludes that the parties are only partially correct. In particular, while the question of whether there has been a novation is one for the Court to decide, the effect of termination *in the absence of a novation* – namely, whether the parties envisioned that under the License Agreement, post-termination disputes would be arbitrated or litigated – are properly resolved by the arbitrator.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986). The question of arbitrability is governed by the Federal Arbitration Act ("FAA"), which gives federal courts jurisdiction over contracts affecting interstate commerce that contain an arbitration provision. 9 U.S.C. § 4. Where a contract affects interstate commerce, the court's role under the FAA is limited to determining: 1) whether a valid agreement to arbitrate exists and if it does, (2) whether the agreement encompasses the dispute at issue. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

While the existence of an agreement to arbitrate is a question for the court to decide, questions concerning termination provisions are, generally, properly decided by the arbitrator. *See Brotherhood of Teamsters and Auto Truck Drivers Local #70 v. Interstate Distributor Co.*, 832 F.2d 507 (9th Cir. 1987). In *Brotherhood of Teamsters*, the Teamsters entered into a collective bargaining agreement with Interstate containing a broad arbitration provision. *Id*. at 508. The agreement also contained a standard termination clause specifying that the agreement would expire on March 31, 1985, and providing for automatic one-year renewals in the absence of advance written notification of intent to terminate. *Id.* In January 1985, approximately two months prior to the expiration of the agreement, Interstate notified the Teamsters that it wanted to modify the agreement. *Id*. A week later, the Teamsters responded that they were willing to "open" the agreement. *Id*. No further discussions occurred until June 1985, when Interstate notified the Teamsters that it was going to withdraw recognition at the end of the month. *Id*. at 509. On July 2, 1985, Interstate made changes to its operations that the Teamsters asserted violated the collective bargaining agreement and sought to submit the dispute to arbitration. *Id*. Interstate, however, refused to arbitrate on the basis that the agreement to arbitrate had been terminated on March 31, 1985, when the initial term of the agreement expired, and therefore there was no agreement to arbitrate. *Id*.

The court in *Brotherhood of Teamsters* concluded that the question of whether the agreement to arbitrate expired or was terminated was a question for the arbitrator rather than the court. *Id.* at 510. The court explained its conclusion as follows:

> In the case before us, the real question is one step removed from the issue of substantive arbitrability discussed in *AT & T Technologies*. The disagreement between the parties here is not primarily over what the arbitration clause provides, or what its scope is, but rather concerns the effect to be given a letter--or an exchange of letters--under the terms of the termination or expiration clause of the parties' collective bargaining agreement. In short, the real dispute is over the proper meaning or interpretation of the termination clause. Where, as here, the petitioner claims that the parties have agreed to allow an arbitrator to decide whether a contract containing an arbitration agreement has been terminated or remains in effect, the proper judicial inquiry is not the one that the district court made--i.e., what does the termination clause provide and how should it be construed?--but rather, have the parties agreed that an arbitrator should decide that question? And, where as here, the agreement contains a broad arbitration clause covering all disputes concerning the meaning of the terms and provisions of the agreement and the clause does not expressly exclude disputes over the termination provision, the answer is, again, simple. Disputes over expiration or termination must be submitted to arbitration.

7

*Id.*

On the other hand, courts seem to agree that the question of whether a subsequent agreement constitutes a novation is a question to be decided by the court rather than the arbitrator. *See, e.g., Great American Trading Corp. v. I.C.P. Cocoa, Inc.,*, 629 F.2d 1282, 1287 (7th Cir. 1980) (holding that question of whether subsesequent agreement effected a novation of earlier agreement went to whether there existed an agreement to arbitrate and therefore was for the court to decide); *Stinson v. America's Home Place*, 108 F. Supp. 2d 1278, 1287 (M.D. Ala. 2000) (treating question of whether subsequent agreement constituted a novation as one for court to decide); *China Resource Products Ltd. v. Fayda Int'l, Inc.,* 747 F. Supp. 1101 (D. Del. 1990) (same).  This distinction makes sense because, as discussed below, the focus of the inquiry with respect to novation is the intent of the parties with respect to the subsequent agreement rather than interpretation of the termination provisions in the contract containing the arbitration clause.

Here, BriteVision advances two arguments in support of its contention that it is not bound to arbitrate the issues raised by Java Jacket in its Arbitration Demand.  First, BriteVision argues that the May 28 Agreement constitutes a novation of the agreement to arbitrate in the License Agreement.  Second, BriteVision asserts that it is clear from the language used in Section 14 of the License Agreement, addressing the effect of termination, that the parties did not intend that the arbitration clause would survive termination of the agreement.  In particular, BriteVision points to the reference to "relief as any Court with jurisdiction may deem proper" in Section 14.

The latter issue involves a question of interpretation of Section 14 of the License Agreement – a question which the parties agreed to arbitrate in Section 19, which covers "any controversy between the parties . . . including interpretation of this Agreement."   Therefore, for the reasons set forth in

*International Brotherhood*, this issue is properly decided by the arbitrator.[3] On the other hand, BriteVision's argument that the May 28 Agreement constituted a novation must be addressed by the Court.

### C. Novation

BriteVision asserts that the arbitration clause in the License Agreement is a nullity because the obligations under the License Agreement were substituted by the May 28 Agreement, which contains no arbitration clause. The evidence in the record does not support BriteVision's assertion.

A novation is the substitution of a new obligation for an existing one and occurs when "the parties intend the new contract to replace all of the provisions of the earlier contract . . . ." Restatement (Second) of Contracts § 279; *see also Eagle Indus., Inc. v. Thompson*, 321 Or. 398 (1995); *Eckhart v. Brown*, 34 Cal. App. 2d 182 (1939).[4] Where a novation has occurred, the obligations of the original agreement are extinguished. The burden is on the party claiming the novation to establish that a novation has occurred. *See China Res. Products (U.S.A.) Ltd.,* 747 F. Supp. at 1106 (citing 15 S. Williston, *A Treatise on the Law of Contracts* § 1869 at 615 (3d ed. 1972)).

---

[3] The Court rejects BriteVision's assertion that this case is distinguishable from *Brotherhood of Teamsters* because that case concerns a collective bargaining agreement. *See* Motion at 6 n. 3. The reasoning that justifies the court's holding in *Brotherhood of Teamsters* – that the parties agreed to arbitrate issues related to the interpretation of the agreement and therefore, disputes involving the effect of termination are themselves governed by the arbitration clause – is equally applicable here. However, even if the Court were to reach the question of whether Section 14 creates an exception to the obligation to arbitrate under Section 19, the Court would reject Britevision's position. Section 19 creates a broad obligation to arbitrate any "controversy between the parties or claim arising out of or relating to this Agreement, including, without limitation, the making, performance or interpretation of this Agreement." Morrison Decl., Ex. A (Settlement Agreement), § 19. In order to create an exception to this broad requirement, the termination provision must negate the presumption favoring arbitrability "expressly or by clear implication." *See Homestake Lead Co. v. Doe Run Res. Corp.*, 282 F. Supp. 2d 1131, 1140 (N.D. Cal. 2003) (holding that arbitration agreements have a "life and validity separate and apart from the agreement in which they are embedded" and therefore, "where the dispute is over a provision of the agreement, the presumption favoring arbitrability must be negated expressly or by clear implication"). Section 14 does not meet this standard. First, it contains no express exception to the arbitration requirement. Second, the mere reference in Section 14 to "relief as any Court with jurisdiction may deem proper" is too vague to create an exception "by clear implication." *See id.* That language indicates that the parties agreed as to the *types* of remedies that would be available. It does not clearly indicate agreement as to the forum in which those remedies would be available.

[4] The existence of a novation is governed by state law. *Perry v. Thomas*, 482 U.S. 483, 491 n. 9 (1987). Here, the License Agreement specifies that Oregon law governs the interpretation of the Agreement. However, the parties did not brief the question of whether this provision should be applied where the agreement that allegedly supercedes the License Agreement does not contain a choice of law provision. Given that BriteVision is a California corporation, it is possible that California law rather than Oregon law governs this issue. The Court need not reach this issue, however, because the relevant law concerning novation is the same under California and Oregon law.

Here, the May 28 Agreement that BriteVision argues constitutes a novation contains none of the typical language associated with a novation. *See, e.g., Eagle Indus.*, 321 Or. at 406 (holding that where subsequent agreement expressly stated that it "supercede[d] all prior written and oral communications or understandings and agreements between the parties relating to the subject matter hereof," that agreement substituted and supplanted prior contracts on the same subject matter). To the contrary, it is clear on its face that the May 28 Agreement was merely an interim arrangement to allow the parties to continue to do business for the month of June. The circumstances surrounding the May 28 Agreement further support this conclusion. In particular, at the time the parties entered into the May 28 Agreement, they were continuing to exchange proposals regarding a Production and Sales Agreement. That proposed agreement was a comprehensive agreement and included an arbitration clause. Further, the letter from Morrison that accompanied the May 28 Agreement requested that Sorensen sign it "since it looks like we won't have any new agreement in place until sometime in June." Based on the undisputed facts, the Court concludes that there was no novation. Therefore, BriteVision has not demonstrated sufficient likelihood that it will prevail in this action to justify the imposition of a preliminary injunction.

**D.     Amount in Controversy Requirement**

Java Jacket argues that there is no jurisdiction under 28 U.S.C. § 1332, governing diversity jurisdiction, because the amount in controversy is less than $75,000.00. In support of this assertion, Java Jacket points to its Arbitration Demand, in which it expressly seeks relief in the amount of $50,000.00. *See* MacDonald Decl., Ex. A (December 27, 2004 Arbitration Demand). BriteVision counters that Java Jacket's position fails because it has not demonstrated to a legal certainty that the amount in controversy is less than $75,000.00 or that BriteVision's invocation of diversity jurisdiction is in bad faith. The Court agrees.

The amount in controversy requirement is generally determined by the amount claimed in the complaint, and this amount "controls if the claim [was] made in good faith." *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938). However, a district court may be justified in dismissing the action where it appears to a legal certainty that the actual claim is less than the jurisdictional amount. *Id.* "Only three situations clearly meet the legal certainty standard: 1) when the terms of a contract limit the plaintiff's possible recovery; 2) when a specific rule of law or measure of damages limits the amount

10

of damages recoverable; and 3) when independent facts show that the amount of damages was claimed merely to obtain federal court jurisdiction." *Pachinger v. MGM Grand Hotel-Las Vegas, Inc.,* 802 F.2d 362, 364 (9th Cir. 1986) (*citing* 14A Wright, Miller, and Cooper, Federal Practice and Procedure, Jurisdiction, § 3702 at 48-50 (2d ed. 1985)).

Here, the arbitration demand is for $50,000.00. In addition, because Section 19 of the License Agreement expressly provides for an award of attorneys' fees to the prevailing party in the arbitration, BriteVision may be liable for substantially more than $50,000.00. *See Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) (holding that where attorneys' fees are recoverable by statute or pursuant to contract, they may be included in the amount in controversy). In light of this evidence and in the absence of any of the three conditions stated above, the Court cannot say to a legal certainty that the amount in controversy requirement has not been met. Therefore, the Court rejects Java Jacket's assertion that there the requirements of diversity jurisdiction have not been met.

**IV.   CONCLUSION**

For the reasons stated above, the Motion is DENIED. The next case management conference is currently scheduled for June 3, 2005.

IT IS SO ORDERED.

Dated: May 10, 2005

/s/ Joseph C. Spero
JOSEPH C. SPERO
United States Magistrate Judge

11